**In Re**:

THE COMMUNITY HOUSE
ASSOCIATION,
BIRMINGHAM, MICHIGAN

      Debtor.

Case No. 26-43351
Ch.      11
Judge:   Thomas J. Tucker

## CITY OF BIRMINGHAM'S RESPONSE IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF ORDER AUTHORIZING THE SALE OF DEBTOR'S PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS (BUT SUBJECT TO PERMITTED EXCEPTIONS) AND FOR CERTAIN RELATED RELIEF

The City of Birmingham (the "**City**"), as the proposed purchaser of the Debtor's Property,[1] files this response in support of the Sale Motion and in opposition to the "Notice of Alternative Offer to Purchase Property Described in [the Sale Motion]" (the "**Pulte Notice**") filed by the "Julie and Mark Pulte Charitable Foundation" ("**Pulte**") at Docket No. 77, construed by the Court as an objection to the Sale Motion pursuant to Docket No. 81 in its *Order Denying the Debtor's Ex-Parte Motion to Strike "Notice of Alternative Offer to Purchase Real Property Described in DE 65, for Entry of Order Authorizing the Sale of Debtor's Property Free and Clear of All Liens, Claims, Encumbrances, and Interests (But Subject to*

---

[1] Terms not defined herein shall have the meanings ascribed to them in the *Debtor's Motion for Entry of Order Authorizing the Sale of Debtor's Property Free and Clear of All Liens, Claims, Encumbrances, and Interests (But Subject to Permitted Exceptions) and For Certain Related Relief* (DN 65) (the "**Sale Motion**").

*Permitted Exceptions) and for Certain Related Relief"* or *Request for Expedited Hearing (Docket No. 80)* (the "**Motion to Strike**").  As set forth in more detail below, as an unsuccessful bidder for the Property, Pulte lacks standing to object to the Sale Motion.  Even if Pulte did have standing, its implied objection to the sale, *i.e.* that Debtor's agreement with the City is not supported by sound business reasoning and not within the discretion of the Debtor under Section 363, because Debtor should have selected its bid instead, should be overruled. The Debtor's marketing of the Property, negotiations with multiple parties including Pulte and the City, and ultimate decision to accept the City's offer and proceed with the Sale Motion by private sale are fully described in the Sale Motion, as supplemented in the Motion to Strike, and are well within the Debtor's business judgment and this Court's broad discretion to approve the transaction pursuant to Section 363 of the Bankruptcy Code, and Pulte has no standing nor any other right to supplant its judgment for the business judgment of the Debtor.

**A.     The Pulte Notice Should be Overruled for Lack of Standing**

1.     The Sixth Circuit has made clear that frustrated bidders do not have standing to object to the sale of property of the debtor.

> Frustrated bidders do not have standing to object to the sale of property. Although an exception exists where an unsuccessful bidder challenges the intrinsic structure of the sale because it is tainted by fraud, mistake, or unfairness . . . PSC did not allege or offer any evidence of intrinsic unfairness. PSC merely objected to the bid process as a disappointed bidder seeking a new auction. PSC is thus not within the "zone of

interests" to be protected by the Bankruptcy Code and applicable law. In addition, as the district court held, because PSC was a potential purchaser, it lacked any interest in the property.

PSC also failed to establish that it was aggrieved by the Bid or Sale Order because PSC was not "directly and adversely affected pecuniarily by the order." PSC lacked standing because it did not establish that the Sale Order diminished its property, increased its burden or impaired its rights. Further, as the district court found, PSC's letter stating that it wished to submit a bid did not meet the criteria for a "qualified bid" pursuant to the terms of the Bid Order, PSC was not a qualified bidder. Thus, PSC has no basis, let alone standing, to challenge the structure of the bid procedures. In sum, the district court correctly held that PSC lacked standing to pursue the appeal.

*In re Squire*, 282 F. App'x 413, 416 (6th Cir. 2008) (citations omitted); *see also e.g. In re TAJ Graphics Enters., LLC*, 592 B.R. 668, 670 (Bankr. E.D. Mich. 2018) (""[A] party who files a motion seeking relief in a bankruptcy case, or who objects to another party's motion for relief, must have a pecuniary interest in the outcome of the motion, in order to have standing").

2. Like the frustrated bidder in *Squire*, Pulte clearly has no pecuniary interest in the outcome of the Sale Motion. Pulte is not a party in interest or creditor in this bankruptcy case, and is a stranger to this case and the Debtor other than its unsuccessful bid. Also like the frustrated bidder in *Squire*, Pulte does not challenge the intrinsic structure of the sale by alleging it was tainted by fraud, mistake, or unfairness, nor could it. The Debtor's process of marketing the Property, negotiations with multiple parties including Pulte and the City, and its ultimate decision to accept the City's offer and proceed with the Sale Motion by private sale,

3

are fully described in the Sale Motion and the Motion to Strike and are well within the Debtor's business judgment and this Court's broad discretion to approve the transaction, and Pulte has no standing nor any other conceivable right to supplant its judgment for the business judgment determination of the Debtor. *See e.g. In re 160 Royal Palm, LLC*, 600 B.R. 119, 127-28 (S.D. Fla.), aff'd, 785 F. App'x 829 (11th Cir. 2019) (affirming bankruptcy court's granting Chapter 11 debtor's motion to withdraw public auction procedures in favor of private sale) ("[T]he Debtor's choice was between taking advantage of the LR APA, which offered finality, certainty, and a price $ 7.6 million above the stalking horse bid, and the uncertainty of delaying the sale yet again, for the promise of a bid just 2.5% higher than the LR bid. Although a different debtor might have come to a different conclusion, the Debtor here has been clear that it is pursuing a "bird in the hand" approach and sought the finality and certainty of the LR offer. The use of a private sale, to take advantage of the offer made by LR, was within the Debtor's business judgment, and the Court sees no reason to supplant its judgment for the business judgment determination of the Debtor.")

3. Accordingly, this Court should overrule Pulte's objection for lack of standing.

**B. The Debtor's Proposed Sale to the City Should Be Granted Pursuant to 11 U.S.C. §363 As An Exercise of Debtor's Sound Business Reason**

4. Pulte lacks standing to raise any objection to the proposed sale and the Pulte Notice should be overruled on that basis alone. The City will therefore only briefly address Pulte's underlying allegations that the proposed sale to the City is not allowable under Section 363.

5. Pulte is simply wrong that the details of its failed bid were "critical facts" that should have been disclosed in the Sale Motion. Debtor, in its Sale Motion, more than meets its burden under Section 363 to justify its decision to enter into the agreement. The Sale Motion provides, among other things, extensive explanation and support for Debtor's marketing and negotiation efforts leading up to the acceptance of the City's offer. *See* Sale Motion at p.2, at ¶¶18, 21, 23, 24, 25, 26, 27; *Gaudreau Declaration*, Sale Motion Exhibit 5(a), at ¶8; *Bockart Declaration*, Sale Motion Exhibit 5(b), ¶¶3, 9, 10 and 11. The Sale Motion also offers compelling business justifications for the proposed sale of the Property, including the satisfaction of all claims (the purchase price more than doubling the total amount of claims), sufficient excess proceeds to fund Debtor's future philanthropic endeavors, its need for a timely closing of a sale given its lack of resources and inability to fund protracted litigation, the satisfaction of the Property's Deed Restrictions and resolution of ongoing litigation with the City, and the likelihood of litigation in the

5

event that the Debtor attempted to sell the Property to a different party regarding compliance with the Deed Restrictions and other issues.[2] *See* Sale Motion at ¶47.

6. Even if Pulte had standing and a right to object to the Sale Motion, their purported reasons why their bid is "higher and better" do not have merit. Before discussing Pulte's described offer, it is important to first understand the Deed Restrictions on the Property.

7. In summary, the Deed Restrictions encumbering the Property require it to be: (A) used to encourage, engage in and carry on social, philanthropic and civic activities among and for the residents of the City and to provide and maintain a center therefor by maintaining the Community House Property (the "**Intended Purposes Covenant**"); and (B) upon the triggering of the dissolution-and-abandonment clause in section 4 of the Deed of Trust, either conveyed via quit claim deed to another charitable, benevolent or educational organization in the City of Birmingham subject to the payment of all debts and the liquidation of all liabilities, or instead, leased for a nominal rental to the City to be used by it for a community center for the benefit

---

[2] To further illustrate the Debtor's point regarding potential litigation, in a hypothetical alternative sale to Pulte, the City would argue, among other things, that the Property could not be sold free and clear of the Deed Restrictions pursuant to Section 363 to Pulte because (a) Pulte's intended use of the Community House violates the Deed Restrictions and (b) the proposed sale to Pulte violates the Deed Restrictions because, among other reasons, Pulte is not "a charitable, benevolent or educational organization in the said [City] of Birmingham" eligible to receive conveyance of the property, and that none of the exceptions under Section 363(f) would be met. *See* ¶¶8-9, *infra*. *See also e.g. In re Inwood Heights Hous. Dev. Fund Corp.*, No. 11-13322 MG, 2011 WL 3793324, at *7 (Bankr. S.D.N.Y. Aug. 25, 2011) ("the Debtor cannot use the Bankruptcy Code to obviate compliance with any sale restrictions contained in the Deed").

of the public (the "**Conveyance Covenant**"). *See* **Exhibit A** (1927 Articles of Association, Art. III); *Sale Motion* at Exhibit 6(b) (the 1930 Deed of Trust at p. 2 and p.5, ¶4); and *Sale Motion* at Exhibit 6(c) (the Probate Order and Quit Claim Deed). These Deed Restrictions have been continuous and unbroken for nearly a century—from the original 1930 Deed of Trust, through the 1989 Probate Court Order, and up to the present day. Certain aspects of the Deed Restrictions are the subject of ongoing litigation and disputes between the City and the Debtor that would be resolved pursuant to the proposed sale of the Property to the City.

8.      With respect to the Intended Purposes Covenant, based on the Pulte Notice, it is the City's position that the Pulte offer would not comply with the Deed Restrictions. First, it is unclear which Pulte family foundation would be the actual owner and operator. While the Pulte Notice states that the Michigan-based Julie and Mark Pulte Foundation would be the buyer, the actual foundation described in the Pulte Notice appears to be the Florida-based Pulte Family Foundation, as further discussed below.[3] Second, while Pulte vaguely and conclusorily claims it would

---

[3] Upon information and belief and based on the publicly available IRS Form 990-PF, the "Julie And Mark Pulte Charitable Foundation" ("Julie and Mark Pulte Foundation") appears to be a personal family foundation used to make personal donations to preferred charitable causes. Upon information and belief, for the year 2024, the foundation made 25 donations totaling $89,389. 18 of the donations were categorized with the purpose of "Religious Outreach". The foundation's assets consist entirely of cash ($106,603) and corporate stock in Amazon.com Inc. ($236,941 fair market value). On the other hand, upon information and belief and based on the publicly available IRS Form 990-PF, the Pulte Family Charitable Foundation Inc. (the "Pulte Family Foundation"), based in Boca Raton, Florida, appears to be a multigenerational Pulte family institution with a headquarters building in Florida valued at $4,401,678 and other land valued at $5,554,874. The

satisfy the Deed Restrictions because it "intends to use the Property for non-profit, charitable purposes consistent with its history as a gathering place for the Birmingham Community and others," Pulte also states that it plans to use the Community House as a "community venue" as an "experienced[4] operator" of other "community venues" that it states are "like the Community House," in an apparent reference to the Pulte Family Foundation's portfolio of three other "Humanitarian Hotels" that it operates. *See* Pulte Notice at p. 2; *see also* https://www.saintjohnsresort.com/pulte-family-foundation. According to its statements, the Humanitarian Hotels donate 100% of their net profits to support selected charitable initiatives (presumably primarily religious in nature, based on the foundations' record of giving)[5] and "[a]dditionally . . . undertake programming for

---

foundation holds interests in hotel properties through disregarded entities. The Estate of William J. Pulte bequeathed two hotels, and a living donor gifted one hotel to the foundation. These are described as "Humanitarian Hotels" where 100% of net profits support selected charitable efforts globally. The foundation also holds four disregarded entities with a combined book value of approximately $199 million along with corporate stocks ($256.3 million FMV), corporate bonds ($57.6 million FMV), private equity investments ($109.2 million FMV), land held for investment ($154,000), and notes receivable of $1.1 million (a loan to Catholic Revival Initiative Inc at 0% interest), with total assets $648,572,789 at fair market value and $40.4 million in total revenue.

[4] The Pulte Notice states that the entity designated by the City to be the actual purchaser, the City of Birmingham Community House Foundation, is a new non-profit being established by the City. It is important to note that the Birmingham Community House Foundation is a public charity, not a private charity like the Pulte foundations. Civic foundations are also common with area cities (see e.g. https://royaloakcivicfoundation.org/), and the City of Birmingham Community House Foundation will provide a means by which the City of Birmingham can work together with the foundation to manage the facility.

[5] The City notes that the Community House was intended to be, and has always been, dedicated to being a community center for *all* of the residents of Birmingham as a non-religious institution. *See e.g.* BETTY ANGELO AND FRANK ANGELO, THE HEART OF BIRMINGHAM: THE

employees, guests, and nonprofits that represent the Foundation's mission of serving those in need." The Humanitarian Hotels focus on "Dignified Employment . . . Care for Others - Aiding associates in dire straits through quality, affordable housing and emergency financial relief" and "Education - Changing young people's lives with multi-year internships, apprenticeships, and youth development programs." While the Pulte Family Foundation's programming is indeed commendable, it would not satisfy the Intended Purposes Covenant's requirement that the Property be used as a community center to encourage, engage in and carry on social, philanthropic and civic activities among and for the residents of the City.

9. Regarding the other Deed Restriction, *i.e.* the Conveyance Covenant, the proposed sale to Pulte could not be approved because, among other reasons, Pulte is not "a charitable, benevolent or educational organization in the said [City] of Birmingham" eligible to receive conveyance of the Property.

10. Thus, as Debtor stated in its Sale Motion, "[a]ny offer that the Debtor generated would require the Debtor to satisfy the Deed Restriction, or would have faced a likely objection from the City," and a proposed sale to Pulte would have

---

COMMUNITY HOUSE STORY 12 (The Community House Association, 1993) (the Community House is "[a] place where Birmingham folks may meet in friendly fashion has been created here. It is known as a Community House. Although it stands on property owned by St. James' parish, its builders have publicly stated that sectarian religion has no place in the curriculum. It exists for all of us to visit and meet others; to dance, to laugh, to sing and, at times, to hear someone discuss things that interest and educate.")

indeed faced such an objection from the City. *See Sale Motion at ¶27; see also* fn. 3, *supra*.

11.    Pulte's other asserted reasons why its offer was superior are also unavailing. Pulte claims that its offer is higher and better because the purchase price is "the sum of $5,500,000",[6] compared to the City's purchase price of $5,200,000, and because its offer does not include the splitting of any rights to the Endowment. *See* Pulte Notice at p. 2; *see also* Sale Motion, ¶30(F) and at Exhibit 6(a) (Real Estate Purchase Agreement) at ¶27.

12.    First, with respect to Pulte's alleged purchase price, it is unclear whether the Pulte offer would be subject to any adjustments, offsets, conditions or any other terms impacting the purchase price or other aspects of the proposed transaction – few specific details of the offer are provided in the Pulte Notice. Second, all creditors will be paid in full from the proceeds of the sale to the City, with the purchase price being more than double the total amount of claims against

---

[6] Pulte also discloses in a footnote that its last offer prior to the Debtor's acceptance of the City's offer was $4,500,000, but that it excluded certain donated sculptures at the Community House, implying that the additional consideration from the sculptures should have been taken into account by the Debtor. While a moot point, given that Pulte then included the sculptures in its subsequent offer (*see* Pulte Notice at p. 1 and fn. 1), it is important to note that the sculptures are gifts from the Marshall W. Fredericks Foundation to the Community House "in memory of Marshall and Rosaline Fredericks" and to be used "for the enjoyment of the children of the community". As such, it is the City's position that the sculptures could not be sold separately from the Community House building without court approval and involvement of the Michigan Attorney General, as they are subject to a restricted charitable gift with specific purposes that must be honored pursuant to state law. Thus, had the sculptures been excluded, they would not have represented realizable additional value for the Debtor.

the Debtor. As with any other aspect of Debtor's purchase agreement with the City, Pulte (assuming it has standing, which it does not), and any creditor for that matter, lacks any "pecuniary interest" to object to the term of the agreement regarding the Endowment Division. *See In re TAJ Graphics Enters., LLC, id.* Third, the Endowment was given by the Debtor to the Community Foundation of Southeast Michigan ("CFSEM") and, according to the Debtor, are no longer funds of the Debtor, and any distributions are made are at the discretion of CFSEM.[7] Therefore, the alleged distinction regarding the Endowment would not weigh in the Pulte's favor.[8]

13. Even assuming there is a $300,000 or similar gap in the purchase price offers, it would still be well within the discretion of the Debtor to accept the City's offer in light of the risks of being able to consummate a sale with Pulte, in light of continued litigation with and opposition from the City, particularly when the full amount of creditor claims are being paid, and an even greater amount of excess proceeds flowing to the Debtor for future operations. *See e.g. In re 160 Royal Palm,*

---

[7] *See* 341 Meeting Transcript, pp. 27-28 (**Exhibit B**): "[I]n 1993, the then Executive Director of the Community House Association, Gayle Caldwell, signed an agreement with [CFSEM]. And my understanding is that she used excess operating funds to start that charitable fund through the [CFSEM]. And so it is -- I guess I could say it is no longer our money; that we've given that money to [CFSEM]." Thus, CFSEM has full control of the Endowment and restricts the distributions to support for the general or specific charitable purposes of the Community House of Birmingham.

[8] In the event that the sale to the City is not approved, the City reserves all of its rights and claims in this case, including with respect the Endowment, which are included within the matters being released as party of the sale agreement between the City and the Debtor.

*LLC*, id. (noting that Debtor was justified in passing up a 2.5% higher bid by agreeing to a private sale with another bidder).

14. Pulte's other five (5) purported reasons for their offer being higher and better (*see* Pulte Notice at p.2) are equally unavailing. With respect to its first purported reason, whether a Pulte purchase would allow the Debtor to continue to receive any Endowment distributions is speculative and would be subject to litigation. *See* ¶12 above. With respect to its second, fourth and fifth purported reasons, the Julie and Mark Pulte Foundation is apparently *not* an experienced operator of properties, and the Pulte Family Foundation, which may have experience operating hotel properties (not civic centers), is not a Michigan-based non-profit but rather is based in Florida, and it is not the Julie and Mark Pulte Foundation. With respect its third purported reason, the Pulte foundations are also questionably "apolitical organizations", including without limitation based on their publicly available donation records and other publicly available information.

15. Thus, the Debtor has exercised sound business judgment in determining that the proposed sale to the City is in the best interests of the estate, and the Court should approve the Agreement and the sale of the Property to the City by private sale. *See e.g. Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 391 (6th Cir. 1986); *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984); *Committee of Equity Security Holders v. Lionel Corporation (In re Lionel Corp.)*, 722 F.2d

1063, 1071 (2nd Cir. 1983); *In re Chateaugay Corp.*, 973 F.2d 141, 144 (2nd Cir. 1992).

**C.    Conclusion**

WHEREFORE, for the reasons set forth above, the City of Birmingham respectfully requests that this Court enter an order approving the Sale Motion.

Respectfully submitted,

VARNUM LLP

By: */s/ Brendan G. Best*
    Brendan G. Best (P66370)
    Jaye C. Quadrozzi (P71646)
    480 Pierce Street, Suite 300
    Birmingham, MI 48009
    (248) 567-7800
    bgbest@varnumlaw.com
    jcquadrozzi@varnumlaw.com
    *Attorneys for The City of*
    *Birmingham, Michigan*

Dated: June 10, 2026

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**In Re**:

THE COMMUNITY HOUSE
ASSOCIATION,
BIRMINGHAM, MICHIGAN

      Debtor.

Case no.  26-43351
Ch.        11
Judge:   Thomas J. Tucker

**CERTIFICATE OF SERVICE**

I, BRENDAN G. BEST, do hereby certify that a true and correct copy of ***City of Birmingham's Response in Support of Debtor's Motion for Entry of Order Authorizing the Sale of Debtor's Property Free and Clear of All Liens, Claims, Encumbrances, and Interests (But Subject to Permitted Exceptions) and for Certain Related Relief*** has been served upon the parties listed on the Court's ECF transmission list in this case via ECF e-notice on this 10th day of June 2026.

Respectfully submitted,

VARNUM LLP

By: */s/ Brendan G. Best*
    Brendan G. Best (P66370)
    480 Pierce Street, Suite 300
    Birmingham, MI 48009
    (248) 567-7800
    bgbest@varnumlaw.com

Dated: June 10, 2026

    *Attorney for The City of*
    *Birmingham, Michigan*

**Exhibit A**

1927 Articles of Association (see Art. III)

(Non-Profit Corporations)

# ARTICLES OF ASSOCIATION

## OF THE

BIRMINGHAM COMMUNITY HOUSE ASSOCIATION

We, the undersigned, desiring to become incorporated under the provisions of Act No. 84, of the Public Acts of Michigan for 1921, providing for the "organization, regulation and classification of domestic corporations," etc., do hereby make, execute and adopt the following articles of association, to wit:

### ARTICLE I.

The name or title by which said corporation is to be known in law is, ...................................................

................................ Birmingham Community House Association ...........................

### ARTICLE II.

This corporation shall proceed under section........2.............., Chapter 1, Part I, of the above named act.

### ARTICLE III.

The purpose or purposes for which it is formed are as follows:

To encourage, engage in and carry on social, philanthropic and civic activities among and for the residents of the village of Birmingham, Michigan, and to provide and maintain a center therefor by acquiring, leasing, purchasing, improving and maintaining adequate real and personal property.

### ARTICLE IV.

The principal office or place of business shall be at ..The village of Birmingham.....................

.................................................................in the county of ....Oakland .................................

### ARTICLE V.

(a) The amount of assets which said corporation possesses is:

Real property:

Equity in lots 94,95, and 96 Merrill Plat, Birmingham,     $3,000.00

Leasehold interest on lot 13, Merrill Plat, Birmingham    2,000.00

Personal property:

           Cash                2,030.00

           Subscriptions receivable   894.50

(b) Said corporation is to be financed under the following general plan:

By the public and private solicitation of funds or donations from and by the residents of the said village of Birmingham and adjacent vicinities but confined within the County of Oakland.

Under the provisions of the above named act said corporation does......not......intend to issue shares of stock, said shares to be in denomination of..................................................dollars each.

## ARTICLE VI.

The term of existence of this proposed corporation is fixed at........Thirty (30)........years from the date of these articles.

## ARTICLE VII.

The incorporating members of the association are as follows

| NAMES. | RESIDENCE ADDRESSES. |
|---|---|
| RUTH SWAIN | 621 Pierce Street, Birmingham, Michigan |
| CECIL WHALEN | 403 Greenwood Avenue, Birmingham, Mich. |
| ANNA C. ADAMS | Adams Road, Birmingham, Michigan |
| IVA MALLOTTE | 539 Pierce Street, Birmingham, Michigan |
| DORIS SIMPSON | 815 Madison Avenue, Birmingham, Michigan |
| ELIZABETH DONOVAN | Walla Walla, Pontiac, Michigan |
| AGNES R. SCHLEY | 509 Lincoln Avenue, Birmingham, Michigan |
| ANNA DONNELLY | Strathmore Drive, Detroit, Michigan |
| KATHERINE HART | 403 Greenwood Avenue, Birmingham, Michigan |

## ARTICLE VIII.

The names and addresses of the officers, trustees or directors (or attorney in fact) for the first year are as follows:

| NAMES. | OFFICE. | ADDRESSES. |
|---|---|---|
| RUTH SWAIN | President | 621 Pierce Street, Birmingham, Mich. |
| CECIL WHALEN | Secretary | 403 Greenwood Avenue, Birmingham, Mich. |
| | Treasurer | Adams Road, Birmingham, Michigan |
| IVA MALLOTTE | Vice-President | 539 Pierce Street, Birmingham, Mich. |
| DORIS SIMPSON | Director | 815 Madison Avenue, Birmingham, Mich. |
| ELIZABETH DONOVAN | Director | Walla Walla, Pontiac, Michigan |
| AGNES R. SCHLEY | Director | 509 Lincoln Avenue, Birmingham, Mich. |
| ANNA DONNELLY | Director | Strathmore Drive, Detroit, Mich. |
| KATHERINE HART | Director | 403 Greenwood Avenue, Birmingham, Mich. |

# ARTICLE IX.

(a) The qualifications required of officers and members are as follows:

The subscription of one dollar or more to the work of the
Birmingham Community House Association.

# ARTICLE X.

Any other statement required by law or desired by the incorporators to be included in the articles.

None

In Witness Whereof, We, the parties designated, as provided by law, by the parties associating as shown under Article VII of these articles, for the purpose of giving legal effect to these articles, hereunto sign our names this _____1st_____ day of _____August_____ A. D., 192_7_

*Ruth Shain*
*Cecil Whalen*
*Anna C Adams*

STATE OF MICHIGAN,  } ss.
County of Oakland

On this _____1st_____ day of _____August_____ A. D., 192_7_ before me, a _____Notary Public_____ in and for the said County of Wayne, acting in the said County of Oakland, personally appeared

Personally appeared Ruth Shain, Cecil Whalen and
Anna C. Adams

known to me to be the persons named in, and who executed the foregoing instrument, and severally acknowledged that they executed the same freely and for the intents and purposes therein mentioned.

*John Martz*
Notary Public, Wayne County, Michigan
acting in Oakland County, Michigan

My commission expires _____September_____, 192_9_

I hereby certify that the following is a copy of a resolution adopted at the organization meeting of the Birmingham Community House Association: "Resolved, that Ruth Shain, Cecil Whalen and Anna C. Adams, they being three of the incorporators, they are hereby designated to sign and acknowledge the articles of association for themselves and for the remainder of the incorporators."

*Cecil Whalen*
Secretary of the meeting.



*ORIGINAL*

Form 290—3-13-27—33f

# MICHIGAN

## ARTICLES OF ASSOCIATION

*(Non-Profit Corporation)*

OF

.......................................

.......................................

## Jnder Act No. 84, Public Acts, 1921

(This blank prepared by John S. Haggerty,
Secretary of State.)

FILED

AUG 9 1927

*John S. Haggerty*

Corporation Division
Department of State
Lansing    —    Michigan.

---

INSTRUCTIONS FOR PREPARING ARTICLES OF ASSOCIATION OF NON-PROFIT CORPORATIONS.

Corporations whose purposes do not include the transaction of commercial or other business for a direct pecuniary profit to the members or stockholders, shall be governed by the provisions of this chapter in addition to such other provisions of this act as may be applicable thereto: Provided, That such corporations may transact business upon the co-operative plan, if done without direct pecuniary profit to the members or stockholders. Such corporations may be organized upon either a stock share basis or upon a non-stock basis, and the membership therein may be limited either as to number or qualifications as fixed in the articles or by-laws.

If organized upon a stock share plan the shares of such corporations shall be of denominations of ten dollars, or a multiple of ten dollars, but shall not exceed one hundred dollars.

The property and lawful business of such corporations shall be held and managed by a board of trustees or directors. No such board shall be less than three in number, and each such trustee or director shall be a member or stockholder of such corporation as the case may be.

No corporation organized for non-profit shall be capitalized for an amount in excess of the sum of money necessary to carry out its purposes, including the purchase or leasing of such property as may be required for its offices or in its lawful business affairs, the payment of salaries and expenses of its officers for a period not exceeding five years from the time of incorporation, and the estimated expense of conducting and consummating its purposes aside from annual or other periodical contributions from sources other than the revenue derived from annual membership fees, and no such corporation shall hereafter be capitalized at more than five hundred thousand dollars without the consent and approval of the Michigan Securities Commission created by Act No. 46 of the Public Acts of 1915, after a hearing upon the merits and necessities therefor.

The provisions of this Chapter shall be held to apply to all associations, societies and corporations of the nature of clubs, boards of trade and commerce, associations of persons engaged in the same or allied professions, trades, occupations and industries, when such persons desire to associate for mutual benefit, comfort or instruction not involving direct pecuniary profit; and to societies for the advancement of particular scientific or sociological, political views or opinions, the collection and dissemination of historical or scientific facts, the advancement of literature, cultivation of art, the prevention of cruel and inhuman practices, and to any other such society whether enumerated herein or not, so long as the purpose or purposes thereof are lawful, and not for direct pecuniary profit of the members; Provided, That any association or society heretofore incorporated and now existing whose purpose is to provide for the relief of distressed members, visitation of the sick, burial of the dead, and the payment of a voluntary sick or burial benefit to or for members, not exceeding in all the sum of one hundred fifty dollars on account of any one member, or the buying and selling of products, for its members without direct pecuniary profit to the association or its members may operate under this chapter as a non-profit corporation.

Where there are more than three incorporators or subscribers they may, by suitable resolution adopted at the organization meeting, designate any three among themselves to sign and acknowledge the articles for themselves and for the remainder of such incorporators or subscribers, in which case the copy of the resolution, duly certified by the person acting as secretary of such meeting shall accompany the articles.

All articles of association must be executed in triplicate and accompanied by following fees: filing, examining and certifying articles—$5.00; franchise fee—$10.00. Uncertified checks will not be accepted.

It is recommended that the blanks furnished by the Secretary of State be used in all cases.

---

CORPORATION DIVISION

AUG 9 1927

COMPARED BY
........................ AND ........

**Exhibit B**

Section 341 Meeting Transcript (Excerpt)

UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF MICHIGAN (Detroit)

Bankruptcy Petition No. 26-43351-tjt

Chapter 11

Voluntary

Asset

Assigned to Trustee Ricardo I. Kilpatrick
_____/

PAGES 1 - 40

Transcription of audio-recorded

341 Creditor's Hearing

before Attorney Timothy Graves representing

U.S. Trustee Andrew R. Vara

held on Friday, April 24, 2026

-SPEAKING ON AUDIO FILE-

TIMOTHY GRAVES
Office of the U.S. Trustee

RICHARDO I. KILPATRICK
On behalf of the Sub-5 Trustee

JASON W. BANK
On behalf of Debtor

JAYE QUADROZZI
On behalf of Debtor

BRENDAN BEST
On behalf of Creditor
City of Birmingham

KURT KOBILJAK
On behalf of Creditor
Chief Financial Credit Union

1

that money while it was in the Plante Moran account. Just on the 21st, they distributed the $44,500 to us through an ACH transfer.

MR. GRAVES: Okay. Thank you. Thank you for that explanation.

There's some sculptures listed that aggregate about $450,000 and there's a notation that it was from an appraisal. Do you know when that appraisal was done?

MS. GAUDREAU: It was just in 2025, the summer of 2025. I'm sorry. I don't know exactly what month it was.

MR. GRAVES: No.

MS. GAUDREAU: (Indiscernible) an appraisal for us.

MR. GRAVES: Okay, that's fine. Thank you. And then we talked about the interest in Community House Endowment Fund held and administered by, I guess it's supposed to be Community Foundation of Southeast Michigan. Is that correct?

MS. GAUDREAU: That's correct.

MR. GRAVES: Okay. Can you tell me what that is?

MS. GAUDREAU: And so in 1993, the then Executive Director of the Community House Association, Gayle Caldwell, signed an agreement with the Community

27

Foundation of Southeast Michigan.  And my understanding is that she used excess operating funds to start that charitable fund through the Community Foundation of Southeast Michigan.  And so it is -- I guess I could say it is no longer our money; that we've given that money to the Community Foundation of Southeast Michigan.

The agreement was for a percentage of that as, you know, according to the Community Foundation of Southeast Michigan's policies that they pay out a percentage of that as a grant to us every year.  And that grant is for a general support of the Community House Association.

MR. GRAVES:  Okay.  And so is the Community Foundation of Southeast Michigan, it's an unrelated entity?

MS. GAUDREAU:  Correct.

MR. GRAVES:  And I think, and I listed on the -- if I remember correct, and I can flip to it if I need to, but I think there's a co-debtor identified as Community House Foundation.  Is that -- is that yet another entity or is that shorthand for Community Foundation of Southeast Michigan?

MS. GAUDREAU:  So in 2018, I believe the then president of the Community House Association formed the Community House Foundation as a separate entity with its

28